b

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

**KEVIN BOWERS,**
**Petitioner**

**CIVIL DOCKET NO. 1:20-CV-01359**

**VERSUS**

**CHIEF DISTRICT JUDGE HICKS**

**DARREL VANNOY,**
**Respondent**

**MAGISTRATE JUDGE PEREZ-MONTES**

## REPORT AND RECOMMENDATION

Petitioner Kevin Bowers ("Bowers") filed a Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Because Bowers did not have ineffective assistance of counsel and his conviction is supported by sufficient evidence, Bowers' *habeas* Petition should be DENIED.

## I.    Background.

### A.    Procedural Background

Bowers is contesting his conviction by a jury in the Louisiana First Judicial District Court on one count of manslaughter. ECF No. 1. Bowers was sentenced to life imprisonment as a fourth felony offender. *See State v. Bowers,* 51,545-KA (La. App. 2d Cir. 8/9/17), 244 So.3d 586, writ den., 2017-KO-1637 (La. 6/15/18) 257 So.3d 685. Bowers is presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.

Bowers raises the following grounds for *habeas* relief[1]:

1. Ineffective assistance of counsel where trial counsel failed to secure expert testimony to aid defense at trial.

2. Ineffective assistance of counsel where trial counsel failed to challenge improper jury instructions and failed to seek supervisory writs during trial.

3. Ineffective assistance of counsel where trial counsel failed to object to other crimes evidence which was improperly admitted under La. C.E. art. 403 and failed to ask for a limiting instruction to the jury on other crimes evidence.

4. Ineffective assistance of counsel where trial counsel and appellate counsel failed to raise the issue that the state used different elements and facts than those recited in the indictment in order to gain a conviction.

5. The State failed to present sufficient evidence to support the verdict of manslaughter.

The State opposes Bowers' petition.  ECF No. 16.

## B.    Factual Background

The facts of this case as set forth by the Louisiana Second Circuit Court of

Appeal, in *Bowers,* 244 So.3d at 587-92, are as follows:

> During the early morning hours of August 28, 2014, Shreveport police officers were dispatched to the residence located at 4136 Jacob Street in response to a shooting reported by a 911 call. At the residence, they found DaJuan Kennedy lying face down in the driveway. Paramedics had already determined that Kennedy was dead. Including the victim and the defendant, there were five men present during the moments before and during the shooting who testified as witnesses to all or part of the incident.

---

[1] The Court found that Bowers exhausted his administrative remedies.  ECF No. 9.

Jeremy Shepard, Kennedy's uncle, testified that he and his brother, Roderic Kennedy ("Roderic"), were living in their grandparents' house at 4136 Jacob Street the night that the shooting occurred. Shepard testified that he and Roderic were sitting on a little brick patio in the front of the house. Their nephew, DaJuan Kennedy, arrived around 10:30 p.m. The three men sat in the front yard, talking and drinking beer, and were later joined by Rajohn Chapman.

Shepard testified that around midnight, Bowers drove by the house in a "burgundy Ford," and Chapman flagged him down. Bowers remained in his vehicle while Chapman went out to the vehicle to talk with him. As Roderic approached the vehicle, Bowers accused Shepard of sending Roderic out. Shepard denied sending Roderic, but Bowers began calling Shepard and Kennedy "bitch-ass niggas." Kennedy was offended and challenged Bowers to a fight. Kennedy took off his white T-shirt, stepped onto the home's driveway and asked Bowers again whether he wanted to fight. Shepard testified that Bowers got out of his vehicle and walked toward Kennedy, but Shepard stepped between the two men and broke up the fight. Shepard pulled Kennedy into the front yard and forced him to sit down. Bowers returned to his vehicle and drove off, leaving Shepard, Roderic, and Kennedy in the front yard. Shepard said that he did not observe a gun or any weapon on Kennedy when he removed his shirt. When Kennedy sat down, he put on his shirt, he, Roderic and Dajuan resumed drinking, thinking that the trouble was over. Shepard said that Rajohn was no longer with them, but they were soon joined by another man, Elijah Patton, aka "Poobie."

According to Shepard, five minutes later, Bowers returned to 4136 Jacob Street. He stopped at the front gate of the house. DaJuan and the defendant began having words again and DaJuan was ready to fight. Shepard testified that the defendant said, "y'all bitch-ass niggas really don't want to do this." He got out of the vehicle and walked toward the rear of the vehicle. Shepard stated that he was trying to grab his nephew's (DaJuan) arm and they took off running toward the back of the house. As Shepard and Kennedy ran toward the home, Shepard heard two gunshots. Shepard testified that Kennedy dropped, face first, to the ground after the second shot. Shepard saw Bowers return to his vehicle and drive away. DaJuan told him that he was hit and to call 911. Shepard called 911 and held Kennedy until the ambulance arrived. Shepard denied seeing Kennedy with a gun or

removing a weapon from Kennedy's person. Shepard also noted that he was unaware of any prior altercations between Bowers and Kennedy.

Elijah Patton joined the men just before the shooting occurred. He testified that he is a friend of the Kennedy family and was present when Kennedy was shot. Patton testified that he arrived at the house around 2:00 a.m. He said that as he pulled up to the home in his vehicle, Bowers drove away from the home. As Patton got out of his vehicle, he observed Roderic, Shepard, and Kennedy sitting at a plastic table in the front yard. Patton said that no one else was present.

According to Patton, Kennedy appeared upset. The three men informed Patton of the argument between Kennedy and Bowers. About five minutes after Patton arrived, Bowers returned and jumped out of his vehicle. Bowers began calling the four men "niggas" and walked up to the fence that surrounds the home's front yard. Bowers turned back to his vehicle and retrieved something from the vehicle's trunk. Patton stated that he immediately ran toward the side of the home with Roderic, and as he ran, Patton heard two gunshots. Patton recalled that Kennedy and Shepard were walking toward Bowers when Patton ran away. When Patton returned to the front yard, he observed Kennedy face down on the ground of the driveway. Like Shepard, Patton testified that Kennedy did not have any weapons on him. Patton also testified that he did not hear anyone tell Kennedy to shoot Bowers, nor did he see Bowers with a weapon.

Like Shepard and Patton, Roderic testified that he had been sitting in the front yard of 4136 Jacob Street for several hours the night of the shooting. Roderic was sitting with Kennedy and Shepard when they were joined by Chapman. Roderic stated that Chapman spoke with them for a few minutes before leaving, and Roderic went into the house to get some beer. When he returned to the front yard, Bowers had arrived and appeared to be arguing with Kennedy. Moments later, Bowers drove off just as Patton arrived. Roderic, Kennedy, Shepard, and Patton sat down and continued drinking in the front yard. A few minutes later, Bowers returned. According to Roderic, Bowers got out of his vehicle, mumbled to himself, opened his vehicle's trunk, and pulled out a rifle. Upon seeing the rifle, Roderic told everyone to run. Roderic testified that he ran to the backyard, and as he ran, he heard a gunshot, followed by a second gunshot about four or five seconds later. Roderic heard a scream and ran back to the front yard and saw

Kennedy face down on the ground. Kennedy tried to lift his head, but Roderic instructed him not to move. Roderic then called 911, and Kennedy died while waiting for the ambulance. Roderic noted that Bowers fled the scene as Roderic returned to the front yard.

Roderic denied that he had an argument with Bowers or asked him to return the scale he borrowed from Shepard. Roderic also testified that Kennedy was unarmed, and he did not tell Kennedy to shoot Bowers.

Dr. Long Jin, the forensic pathologist who performed Kennedy's autopsy, testified at trial describing the path of the bullet and the cause of death. Dr. Jin stated Kennedy was shot in his left back. The bullet moved slightly upward, through Kennedy's spinal cord, right lung, diaphragm, and liver, and exited his right chest. Kennedy bled to death as a result of being shot. Dr. Jin found that the nature of the wound was consistent with someone running. Dr. Jin also testified that he believed Kennedy was originally lying face up on the ground because of abrasions on his body that are consistent with turning him over. Dr. Jin noted that there was no soot in the wound; therefore, Kennedy was not shot at close range.

Several other non-eyewitnesses, police officers and detectives testified at the trial regarding what they learned, knew or witnessed near or after the shooting. Sergeant Carter, one of the several Shreveport Police Department officers who were dispatched to the scene, testified that he and Corporal John Madjerick located two shell casings in the front yard about 6 to 8 feet apart. The shell casings appeared to be 5.56 casings typically used in AR–15 type assault rifles. Apparently a third shell casing of the same caliber was found nearby. Cpl. Madjerick testified that he located a total of three spent cartridges and one live round at the scene.[1] One unfired cartridge was located near Kennedy's body in the driveway. Cpl. Madjerick testified that the live round, a 10–mm cartridge, was discovered under Kennedy's body as it was being removed from the scene. He stated that the bullet was typically used in a handgun. A gunshot residue test was not conducted on Kennedy's hands because, he said, the results are generally inaccurate. He was unable to determine from where the live round came, and no firearms were recovered. A pair of dice was also recovered but not submitted for fingerprint or DNA analysis.

Katoria Eason, Bowers' aunt, who resides at 4140 Jacob Street, was home when the victim was shot. Eason testified that her nephew, Jemarcus, woke her up in the early hours of August 28, 2014, and the two of them went outside and stood in her front yard. From her location, she observed Kennedy's body on the ground in the front yard. While standing outside, she received a cell phone call from the defendant asking her to check on Kennedy. Eason refused because Kennedy already appeared dead. Eason left her front yard, stood next to a police car, and remained there until she was brought to the police station for additional questioning. Eason said that she attempted to call Bowers again at the police's request; however, when Bowers answered his phone, a police officer took Eason's phone and began speaking to Bowers. Bowers hung up the phone and did not answer subsequent calls. Eason added that Bowers visited her home every day, but she did not see him the night of the shooting.

Police learned that Bowers was hiding within the Quail Creek apartment complex. Upon discovering Bowers in apartment 1000–B, Bowers was restrained by Cpl. McCloskey's K–9 partner, who bit Bowers in the arm. Cpl. McCloskey testified that Bowers was discovered in the rear bedroom attempting to hide in a corner of the room under bed linens.

Corporal Taywania Jackson, who accompanied Cpls. Jones and McCloskey to arrest Bowers, testified that she advised Bowers of his Miranda rights. Bowers told her that on August 28, 2014, he argued with Kennedy's uncle, who instructed Kennedy to shoot Bowers. Bowers claimed he pled with Kennedy to not shoot him and that he shot Kennedy in self-defense. Cpl. Jackson testified that several officers and marshals instructed Bowers not to speak, but Bowers continued to "babble and go on and on."

Shreveport Police Cpl. Jeff Couch testified that on October 8, 2014, he and another officer transported Bowers to the hospital after he was arrested. During transport, Bowers made additional statements recorded on Cpl. Couch's in-vehicle recording device and were delivered to the district attorney's office. During Cpl. Couch's testimony, the recording of Bowers' in-vehicle statements were played for the jury. In the recording, Bowers admitted to shooting Kennedy; however, he was adamant that he was acting in self-defense.

Finally, Detective Dailey testified that he was assigned to this case on August 8, 2014. He spoke with several witnesses. He testified that he showed Patton a six-person photographic lineup, and Patton identified Bowers as the shooter.

The defense called three witnesses: Rajohn Chapman, Katoria Eason, and the defendant. Chapman testified that he arrived at 4136 Jacob Street around 4:30 p.m., prior to the shooting. Chapman stated that Kennedy, Shepard, and Roderic were drinking, but denied seeing drug activity. According to Chapman, Bowers arrived in his vehicle at the home around 11:00 p.m. and invited Chapman to a club to see a rap group perform. Chapman testified that Bowers remained in his vehicle as they spoke, and while they were speaking, Roderic approached Bowers' vehicle and asked Bowers about a scale Shepard had loaned him.

An argument broke out between Bowers, Roderic, and Kennedy. Bowers exited his vehicle and confronted Kennedy in the home's front yard. Kennedy left the front yard, went into the home, and returned with a black handgun. Chapman stated that Bowers, upon seeing the gun, returned to his vehicle and drove away, ducking down as he drove. Chapman then witnessed Kennedy walk to the end of the driveway and point the gun at Bowers' retreating vehicle. Patton arrived as Bowers drove away, and Bowers returned a few minutes later. Chapman testified that Bowers exited his vehicle without a gun and asked Kennedy to put his gun down. Kennedy placed the gun in the back of his pants and removed his shirt, as if preparing to fight. Chapman stated the two men stared at each other for a moment, and Kennedy put his shirt back on and pulled out the gun. Chapman claimed that he heard Roderic tell Kennedy to "bust [Bowers]." Bowers moved to the passenger side of his vehicle and Kennedy pointed the gun at Bowers. Bowers then pulled a gun from his vehicle, and Chapman heard gunshots.

Chapman stated that he was sitting on the home's front porch when two or three shots were fired. After the shots were fired, Chapman claimed that he left the porch and went over to Kennedy, who was lying face down in the front yard. Chapman testified that he turned Kennedy over and, after seeing that Kennedy was bleeding, instructed Shepard to call 911. Chapman testified that he did not see Kennedy's gun, nor did he see anyone remove the gun from Kennedy's body.

Chapman then went to 4140 Jacob Street and informed Eason and her family of the shooting. Chapman told Eason what he observed but left the scene without speaking to the police officers as he had several outstanding warrants.

On cross-examination, Chapman testified that he saw Bowers shoot Kennedy and that the impact from being hit propelled Kennedy backwards, but Kennedy fell face down. Chapman also stated that at some point, he turned Kennedy over to see whether he was hit.

Katoria Eason returned to the stand. She testified that she spoke to Chapman after the shooting, and Chapman told her that Kennedy pulled a gun on Bowers and tried to shoot Bowers. Chapman also told her that Kennedy's gun jammed, so Bowers shot him. Eason stated that she relayed this information to the police.

Kevin Bowers testified on his own behalf. He said that he has known the Kennedy family his entire life, and there was no bad blood between the families. Bowers stated that on August 8, 2014, he was temporarily living at 4140 Jacob Street. That night, while returning to 4140 Jacob Street to retrieve some clothes, he stopped at 4136 Jacob Street around 11:00 p.m. Bowers testified that he stopped his vehicle in front of the home at 4136 Jacob Street and observed Shepard, Chapman, Roderic, and Kennedy sitting in the front yard. Bowers, still in his vehicle, spoke to the men and invited them to a club. While Bowers spoke, Roderic approached Bowers' vehicle and asked Bowers to return a scale he borrowed from Shepard. Bowers told Roderic that he did not have the scale, which Bowers said was fine with Shepard but made Roderic angry. Roderic began to argue with Bowers when Kennedy approached Bowers' vehicle and threatened to fight him. In response, Bowers got out of his vehicle, walked to the front of his vehicle, and stood in front of Kennedy, who backed away.

Bowers said he turned to get back into his vehicle when Kennedy walked out to the driveway and pointed a gun at him. Bowers then got into his vehicle and drove away. In his rearview mirror, Bowers saw that Kennedy was still pointing the gun at Bowers' retreating vehicle, and Bowers ducked down and "hit the gas." Bowers testified that he drove for a few minutes but decided to return to 4140 Jacob Street and collect his clothes. Bowers stated that he passed 4136 Jacob Street and stopped in front of 4140 Jacob Street. As he got out of his vehicle,

Bowers heard Roderic calling him names. Bowers walked to the passenger side of his vehicle and confronted Roderic. Kennedy ran into the street and yelled at Bowers, who admitted that Kennedy was not holding a gun at that point. Bowers heard Roderic tell Kennedy to shoot him, and Kennedy reached to the back of his pants and removed a black handgun. Kennedy pointed the gun at Bowers, who ducked behind his passenger door and retrieved his gun, a rifle, from the passenger side of his vehicle. Bowers testified that he did not want to "stand here and wait to see if [Kennedy's] going to shoot me" and fired his weapon at the ground. When the gun went off, Bowers stated that everyone in the front yard ran in different directions.

After the first shot, Bowers returned to the driver's side of his vehicle and observed Kennedy standing in the home's front yard, still holding the gun. Bowers claimed that Kennedy appeared to shoot and run at the same time, so Bowers ducked and fired his weapon a second time. Bowers testified that Kennedy was still holding the handgun when he fell to the ground. Bowers said he left the scene and he discarded the rifle by throwing it out of his vehicle window.

## II.    Law and Analysis

### A.    Rule 8(a) Resolution

The Court is able to resolve this *habeas corpus* petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact relevant to the petitioner's claims, and the state court records provide the required and adequate factual basis. *See Moya v. Estelle*, 696 F.2d 329, 332-33 (5th Cir. 1983); *Easter v. Estelle*, 609 F.2d 756, 761 (5th Cir. 1980); *Habeas Corpus* Rule 8(a).

### B.    Standard of Review

An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground

that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to *habeas* petitions filed after its effective date on April 24, 1996, *habeas* relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding.  Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254 (d)(1), and questions of fact are reviewed under Section 2254(d)(2).  *See Martin v. Cain*, 246 F.3d 471, 475-76 (5th Cir. 2001), *cert. den.*, 534 U.S. 885 (2001).

C.    <u>Ineffective Assistance of Counsel</u>

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  He must show that his counsel's performance was both deficient (i.e., that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (i.e., that errors by counsel "actually had an adverse effect on the defense).  *See Anderson v. Collins*, 18 F.3d 1208, 1215 (5th Cir.

10

1994) (citing *Strickland*, 466 U.S. at 686-89, 693).  The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  *See id.*  On the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, he must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *See id.*

A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.  *See Harrington v. Richter*, , 104 (2011) (*citing Strickland*, 466 U.S. at 689).  The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  *See id.*

With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *See Richter*, 562 U.S. at 104 (*citing Strickland*, 466 U.S. at 694).  It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.  *See id.*  Counsel's errors must

11

be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *See id.*

> ### D.    Bowers did not have ineffective assistance of counsel.
>
> #### 1.    Bowers has not presented any supporting evidence to show his attorney erred in failing to secure expert testimony.

Bowers contends his trial counsel erred in failing to secure expert testimony to aid the defense at trial by: (1) testing the 10 mm live cartridge found under the victim's body for marks indicating that it was jammed in the gun or misfired; (2) to rebut the State's medical expert testimony regarding the victim's injuries; and (3) to set forth "other reasonable hypotheses of the incident." Bowers argues an expert would have supported his claim of self-defense and indicated that the victim was, in fact, armed.

The issues as to counsel's failure to employ expert witnesses were thoroughly adjudicated by the state courts on post-conviction relief. ECF Nos. 16-8 at 276-77; 16-9 at 311; 16-10 at 340. Therefore, *habeas* relief is not available to Bowers unless he can show that the state court decisions were based on an unreasonable determination of the facts in light of the evidence presented.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993) *(citing Strickland*, 466 U.S. at 691). However, bare allegations do not suffice. A defendant who alleges a failure to

12

investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. *See Nelson*, 989 F.2d at 850 (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *See Graves v. Cockrell*, 351 F.3d 143, 155 (5th Cir. 2003), *amended in other part*, 351 F.3d 156 (5th Cir. 2003), *cert. den.,* 541 U.S. 1057 (2004) (*citing Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)); *see also Evans. v. Cockrell,* 185 F.3d 370, 377 (5th Cir. 2002); *Boyd v. Estelle*, 662 F.2d 388, 390 (5th Cir. 1981). Where the only evidence of a missing witness's testimony is from the defendant, a court views claims of ineffective assistance with great caution. *See Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001) (citing *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir.1986), *cert. den.*, 479 U.S. 1030 (1987). Unless a petitioner provides the court with affidavits (or similar matter) from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice. *See Sayre*, 238 F.3d at 636.

Bowers has not provided the Court with affidavits or other evidence to show what the experts would have said and how they would have aided his defense.[2] Thus, Bowers' argument that he was prejudiced by his attorney's error in failing to call expert witnesses is speculative. Bowers has not demonstrated a reasonable probability that, but for his counsel's failure to request experts, the jury would have had a reasonable doubt concerning his guilt.

### 2. Bowers' attorney did not err in failing to challenge the jury instructions.

Next, Bowers contends he had ineffective assistance of trial counsel because he failed to challenge improper jury instructions and failed to seek supervisory writs during trial. ECF No. 16-5 at 77. Bowers complains that the jury was charged that being a felon in possession of a firearm can be a felony to support a felony-manslaughter conviction. Bowers contends the jury was "misled" and "confused" by the charge.

---

[2] Bowers complains the trial judge and the prosecutor both stated Kennedy had been "shot in the back," whereas the doctor who autopsied him testified the bullet entered the left side of Kennedy's back and exited the right side of Kennedy's front. Bowers argues the bullet went through Kennedy from "side to side" instead of from "back to front." Neither characterization appears to be accurate since the bullet apparently entered Kennedy's back at an angle. Bowers conceded at trial that Kennedy had been shot in the back. ECF No. 16-6 at 15.

The state courts thoroughly analyzed these issues and concluded that, even if experts had testified that the victim had a gun that had jammed when he fired it and that the victim was fleeing the scene when Bowers shot him in the back, there was no reason to believe such testimony would have had any effect on the result of the trial.

Moreover, testing the live 10 mm round found under Kennedy would have been pointless because Kennedy's gun was never found. The round could have been on the ground before the incident occurred.

14

The fact that a jury instruction was incorrect under state law is not a basis for federal *habeas* relief.  A federal court may reverse a state criminal conviction based upon erroneous jury instructions only when the instruction in question rendered the entire trial fundamentally unfair.  *See Gissendanner v. Wainwright*, 482 F.2d 1293, 1300 (5th Cir. 1973); *see also Montoya v. Scott*, 65 F.3d 405, 409 (5th Cir. 1995), cert. den., 517 U.S. 1133 (1996).

Again, the state court thoroughly adjudicated this claim, noting the jury was clearly charged that, when a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.  ECF No. 16-8 at 278; No. 16-9 at 311; No. 16-10 at 340.

Bowers was charged with second degree murder, La. R.S. 13:30.1.[3]  ECF No. 16-5 at 78.  Manslaughter is an authorized responsive verdict to a charge of second degree murder.  La. C. Cr. P. art. 814(A)(3).  "When a count in an indictment sets

---

[3] A. Second degree murder is the killing of a human being:
  (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
  (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

The trial judge charged the jury only as to specific intent second degree murder. ECF No. 16-3 at 69.

15

out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense." La. C. Cr. P. art. 803. Bowers's jury was properly instructed on the responsive verdict of manslaughter, including "felony-manslaughter," under La. R.S. 14:31.[4] ECF No. 16-5 at 79-80.

Bowers appears to argue, correctly, that the elements of felony manslaughter do not fall within the scope of second degree murder.[5]

A system of responsive verdicts involves benefits to both the prosecution and the defense. *See State ex rel. Elaire v. Blackburn,* 424 So.2d 246, 248 (La. 1982), *cert. den.*, 461 U.S. 959 (1983). On the one hand, the system may benefit the

---

[4] La. R.S. 14:31. A. Manslaughter is:
> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
> (2) A homicide committed, without any intent to cause death or great bodily harm.
>> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or . . . .

The trial judge charged the jury as to both "sudden passion" and felony manslaughter. ECF No. 16-3 at 69.

[5] The offense of felon in possession of a firearm does not fall within the scope of second degree felony-murder, La. R.S. 14:30.1(A)(2). Bowers's jury was charged with second degree murder requiring specific intent, La. R.S. 14:30.1(A)(1), and felony-manslaughter pursuant to La. R.S. 14:31(A)(2)(a), which required proof of a felony not listed in La. R.S. 41:30.1(A)(2), to-wit, La. R.S. 14:95.1—possession of a firearm by a convicted felon.

16

prosecution by providing an alternative to acquittal when the evidence does not establish an essential element of the charged offense; on the other hand, the system may benefit the defense when the jury would prefer a choice between the drastic extremes of guilty of the charged offense and not guilty. *See State ex rel. Elaire,* 424 So.2d at 248. "Compromise verdicts are permissible, so long as the evidence supports either the verdict given or the original charge." *State v. Charles,* 2000-1611 (La. App. 3 Cir. 5/9/01), 787 So.2d 516, 519, writ den., 2001-1554 (La. 4/19/02), 813 So.2d 420) (citing *State ex rel. Elaire,* 424 So.2d at 248-249); *see also Barron v. Warden, LaSalle Correctional Center,* 2006 WL 3087683, at *4 (W.D. La. 2006) (report and recommendation).

There is a distinction between those responsive verdicts which are lesser and included grades of the charged offense and those responsive verdicts which are not lesser and included offenses but are nevertheless included in La. C. Cr. P. Art. 814. Lesser and included grades of the charged offense are those in which all of the essential elements of the *lesser* offense are also essential elements of the *greater* offense charged. *See State ex rel. Elaire,* 424 So.2d at 248 (citing *State v. Cooley,* 260 La. 768, 257 So.2d 400 (1972)). Thus, the evidence which would support a conviction of the charged offense would necessarily support a conviction of the lesser and included offense. *See State ex rel. Elaire,* 424 So.2d at 248.

However, in cases of the legislatively provided responsive verdicts which are not truly lesser and included grades of the charged offense, evidence which would

support a conviction of the greater offense would not necessarily support a conviction of the legislatively responsive offense. *See State ex rel. Elaire,* 424 So.2d at 249. In such cases, the evidence may be insufficient to establish an essential element of the lesser crime which is not an essential element of the greater crime. *See State ex rel. Elaire,* 424 So.2d at 249.

Bowers's felony-manslaughter verdict was an appropriate responsive verdict to the charged offense of second degree murder, despite the fact that felony manslaughter is not a lesser-included offense of second degree murder.

Bowers also claims the jury charges as to self-defense and felony-manslaughter were contradictory and confusing. However, Bowers and the State were both entitled to the jury charges applicable to their theories of the case-theories which necessarily contradicted each other. That does not mean the charges were confusing to the jury.

Bowers also argues the jury was charged as to the offense of felon in possession of a firearm, although he was not charged with "felon in possession of a firearm." However, Bowers was charged, pursuant to La. R. S. 14:30.1 (second degree murder) and La. R.S. 14:41 (felony manslaughter), with whatever additional felony was proven at trial, in this case, felon in possession of a firearm (La. R.S. 14:95.1). Bowers was not additionally charged with being a felon in possession of a firearm because that would have constituted double-jeopardy. *See Harris v. Oklahoma*, 433 U.S. 682 (1977) ("When, as here, conviction of a greater crime,

murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one.").   .

Therefore, Bowers has not shown a reasonable probability that, but for his counsel's failure to challenge the jury instruction as to "felony manslaughter," the jury would have had a reasonable doubt concerning his guilt.

Since the correct statutory definitions of felony manslaughter and the relevant felony, felon in possession of a firearm, were given, Bowers has not shown the instructions rendered his trial fundamentally unfair or that his attorney had any basis on which to challenge them or to seek supervisory writs. *See Shelton v. Goodwin,* 2016 WL 6088494, at *6 (W.D. La. 2016), *report and recommendation adopted,* 2016 WL 6107124 (W.D. La. 2016).

Because Bowers has not shown that his attorney had a legal basis to challenge the jury instructions as to felony manslaughter or to seek supervisory writs, he has not shown his attorney erred.   This ground for *habeas* relief is meritless.

### 3. Bowers' trial counsel did not err in failing to object to other crimes evidence or in failing to request a limiting jury instruction.

Bowers argues his trial counsel was ineffective in failing to object to other crimes evidence that was improperly admitted under La. C.E. art. 403, and in failing to ask for a limiting jury instruction as to that evidence.

19

Mere violation of evidentiary rules by the state trial court does not in itself invoke *habeas corpus* relief. *See Panzavecchia v. Wainwright*, 658 F.2d 337, 340 (5th Cir. 1981). Thus, claims challenging the exclusion or inclusion of evidence based on state law do not afford a basis for federal *habeas corpus* relief. *See Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir.), *cert. den*. 524 U.S. 979 (1998). Federal *habeas corpus* review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law. *See id.* In reviewing state court evidentiary rulings, the federal *habeas* court's role is limited to determining whether a trial judge's error is so extreme that it constituted a denial of fundamental fairness under the Due Process Clause. *See id.*.

The admission of improper evidence in a state criminal trial will constitute grounds for *habeas* relief if fundamental fairness was prevented thereby. *See Shaw v. Estelle*, 686 F.2d 273, 275 (5th Cir. 1982), cert. den., 459 U.S. 1215 (1983). What elevates the mistake to a constitutional plane is at least two-fold. *See id.* First, the mistake must be material in the sense of a crucial, critical, highly significant factor. *See id.* Second, it must have some state complicity in it. *See id.*; *see also Hills v. Henderson*, 529 F.2d 397 (5th Cir. 1976), *cert. den.*, 429 U.S. 850 (1976).

Bowers contends the evidence that he as a felon in possession of a firearm at the time of the offense constituted "other crimes" evidence. However, the evidence that Bowers was a convicted felon came out when he was properly questioned as to his prior convictions for second-degree battery, attempted possession of a firearm by

a felon, and attempted possession of marijuana with intent to distribute, and aggravated flight from the police. ECF No. 16-3 at 17. ECF No. 16-3 at 17. La. C.E. art. 609.1(A) states that, "[i]n a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions." The state court ruled that, when Bowers testified as a witness, he was subject to cross-examination as to his prior convictions. ECF No. 16-8 at 278.

Bowers testified that he was in possession of a firearm during the instant offense.[6] Thus, the evidence that he was a convicted felon, and in possession of a firearm, concerned the instant offense, not "another crime." The State may introduce evidence to support possible responsive verdicts.

Because evidence as to Bower's prior convictions was properly introduced into evidence, there was no evidentiary error to which his attorney could object. Bowers

---

[6] Louisiana law generally prohibits the admission of "other crimes evidence," that is, evidence of criminal conduct uncharged in the subject indictment, with exceptions for proving identity, system or *res gestae*. *See Robinson v. Whitley*, 2 F.3d 562, 566 (5th Cir. 1993), cert. den, 510 U.S. 1167 (1994) (citing *State v. Prieur*, 277 So.2d 126, 128 (La. 1973)).

To constitute *res gestae,* the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous action. In such cases the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. *See Robinson*, 2 F.3d at 567. Evidence which does not form part of the *res gestae*, but which merely depicts the defendant as a bad man, may constitute a due process violation if it renders the trial fundamentally unfair. *See id.*

In this case, Bowers's possession of a gun was a part of the offense with this he was charged and was, therefore, admissible evidence.

has not shown that his attorney erred with regard to evidence to support the responsive verdict of manslaughter or that he had ineffective assistance of counsel.

    4.    **<u>Bowers's counsel did not err in failing to object to the facts presented as outside of the scope of the indictment.</u>**

Bowers also claims he had ineffective assistance of trial counsel and appellate counsel because they failed to raise the issue that the State used different elements and facts than those recited in the indictment in order to gain a conviction.

Bowers's indictment charged him with second degree murder, La. R.S. 30.1. ECF No. 16-2 at 15. Louisiana law allows the use of short form indictments, La. C. Cr. P. art. 465; *State v. Bourque,* 622 So.2d 198, 219 (La. 1993)[7] (*citing State v. Baylis,* 388 So.2d 713, 719 (La. 1980); *State v. Liner,* 373 So.2d 121, 122 (La. 1979)). The indictment short form for second degree murder is "A.B. committed second degree murder of C.D." La. C. Cr. P. arg. 465(32). Bowers's indictment complied with the short form statute, and did not set forth any "elements" or facts. Thus, the indictment did not conflict with the evidence presented.

Bowers also argues that the State used elements and facts not included in either the second degree murder statute or in the manslaughter statute to convict him of manslaughter. Bowers is alluding to the evidence that he was a felon in possession of a firearm.

---

[7] *Bourque* was overruled on other grounds by *State v. Comeaux,* 93-2729 (La. 7/1/97), 699 So.2d 16, *cert. den.,* 522 U.S. 1150 (1998).

As discussed above, felony manslaughter is a responsive verdict to second degree murder. Although it is not a lesser-included verdict, it is a legislatively authorized verdict and it is supported by the evidence. *See State ex rel. Elaire,* 424 So.2d at 248.

### E.   Bowers's manslaughter conviction is supported by sufficient evidence.

Bowers contends the State failed to present sufficient evidence to support the verdict of manslaughter.

*Habeas* relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *See West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242 (1997) (*citing Jackson v. Virginia*, 443 U.S. 307, 322-26 (1979)). To apply this standard, a court looks to elements of the offense as defined by state substantive law. *See Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2001).

A jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence is entitled to a great deal of deference by a reviewing court. *See Marshall v. Lonberger*, 459 U.S. 422, 433-35 (1983). In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight. *See Jackson*, 443 U.S. at 322 n.15.

Bowers argues the State failed to prove he had the specific intent to kill or inflict great bodily harm.

The evidence showed that Bowers had prior felony convictions for drug offenses (in violation of the Uniform Controlled Dangerous Substances Law) and battery (a crime of violence).  La. R.S. 14:95.1(A) makes it a felony for a person with those felony convictions to possess a firearm.  Therefore, Bowers was committing a felony by possessing a firearm at the time Kennedy was killed.

Because Bowers was found guilty by a jury of killing Kennedy, and he was  a convicted felon in possession of a firearm when he did so, Bowers was guilty of felony manslaughter under La. R.S. 14:31(A)(2)(a): "A homicide committed, without any intent to cause death or great bodily harm—When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person. . . . ." Therefore, the State was not required to prove that Bowers had the specific intent to cause death or great bodily harm.

Bowers also contends the State failed prove he did not kill Bowers in self-defense.[8]  Bowers argues he shot Kennedy in self-defense.  Under Louisiana law,

_____

[8] "A homicide is justifiable . . . when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20.  "The danger need not be real but the person attacked must reasonably believe that he is in actual danger. . . . [H]e must also reasonably believe that it is necessary to kill in order to save himself. . . . [A] person's belief that he is in danger of losing his life or receiving serious personal injury is not 'reasonable' unless it is founded upon an actual physical attack or

24

"[a] person show brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21.

Bowers testified he was in front of Kennedy's house talking to two of Kennedy's uncles, Jeremy and Roderic, when Kennedy joined them. ECF No. 16-5 at 155-56. Bowers testified that Kennedy offered to fight him. ECF No. 16-5 at 157. Then Kennedy retrieved a gun and pulled it on Bowers, who got into his car and drove away. ECF No. 16-5 at 157-58.

Needing a change of clothes, Bowers then drove to his grandmother's house, which was within sight of Kennedy's house. ECF No. 16-5 at 159. When Bowers got out of his car at his grandmother's house, Kennedy saw him and began calling him names. ECF No. 16-5 at 159. Kennedy walked over to Bowers, who was at his

---

hostile demonstration by the deceased. . . . Some of the other factors which should be considered in determining whether the defendant had a reasonable belief that it was necessary to kill are the excitement and confusion of the occasion, the possibility of avoiding the necessity of killing by using force or violence less than killing, and the party's knowledge of the assailant's bad character." La. R.S. 14:20, Reporter's Comment; *see also State v. Brown*, 93-1471 (La. App. 3d Cir. 5/4/94), 640 So.2d 488, 492-93. "A person who is the aggressor or one who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21.

A defendant who has been charged and is on trial for homicide and asserts that he acted in self-defense does not assume any burden of proof whatever on that issue; the state has the entire and affirmative burden of proving beyond a reasonable doubt that the homicide was not justifiable under the particular circumstances. *See State v. Pittman*, 428 So.2d 979 (La. App. 1st Cir.), *writ den.*, 433 So.2d 155 (La. 1983), *cert. den.*, 464 U.S. 836 (1983).

car, and they squared off to fight.  ECF No. 16-5 at 161.  Then Roderic yelled at Kennedy to shoot Bowers, so Bowers reached to the back of his pants and pulled out a gun.  ECF No. 16-5 at 161.

Bowers testified that he backed up, opened his passenger door, jumped behind it, and yelled to Jeremy, who began yelling at Kennedy to stop.  ECF No. 16-5 at 161-62.  However, Roderic continued to yell at Kennedy to kill Bowers, so Bowers reached into his car, grabbed his own gun, and stepped out from behind the car door.  ECF No. 16-5 at 162.  As Kennedy turned toward Bowers, Bowers shot toward the ground and everyone started to run.  ECF No. 16-5 at 162.

Bowers testified that he ran around the back of the car and tried to jump in the car and take off, but Kennedy (who had run to his driveway) told him to stop.  ECF No. 16-5 at 163.  Bowers testified that he did not see Kennedy's gun at that point.  ECF No. 16-5 at 163.  Bowers said he stopped, saw Kennedy raise his gun, and waited to be shot.  ECF No. 16-5 at 163-64.  Bowers testified the shot never came, and he saw Kennedy lower his arm and cock his gun back.  ECF No. 16-5 at 164.  Bowers then lifted his gun, so Kennedy started running away even as he continued to try to shoot.  ECF No. 16-5 at 164.  Bowers ducked and fired his gun, and Kennedy fell face-down.  ECF No. 16-5 at 164.

It is clear from Bowers' own testimony that he had more than one opportunity to withdraw from the conflict with Kennedy, but failed to do so.  Instead, he squared off with Kennedy, even after Kennedy had already pulled a gun

on him. Then, when Kennedy's gun did not fire, Bowers took advantage of the opportunity to shoot Kennedy as he ran away. Because Bowers did not withdraw when he could have, the State was able to prove Bowers did not shoot Kennedy in self-defense.

Viewed in the light most favorable to the prosecution, the evidence from Bowers's testimony as to his prior felony convictions, the fact that he was in possession of a firearm, and the fact that he shot Kennedy, is sufficient to support Bowers's conviction for manslaughter.

### F.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that Bowers's *habeas* petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the Magistrate Judge is neither required nor encouraged. Timely objections will be considered by the District Judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the**

proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir. 1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases (and other *habeas* cases pursuant to see Rule 1(b)) in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.  *See* 28 U.S.C. § 2253(c)(2).  A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Thursday, February 24, 2022.

HON. JOSEPH H. L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE

28

29